ANNA LOUISE GARRETT, Plaintiff in Error, *vs.* ROBERT L. GARRETT, Defendant in Error.

*Opinion filed December 21, 1911.*

1. APPEALS AND ERRORS—*question of residence of complainant in divorce case is open to consideration in Supreme Court.* The question of the residence of the complainant in a suit for divorce goes to the jurisdiction of the subject matter of the suit, and is open to consideration in the Supreme Court though the point was not raised or passed upon in the Appellate Court.

2. SAME—*what question cannot be considered in the absence of cross-errors.* A finding by the Appellate Court that the evidence justified the jury in finding the husband guilty of extreme and repeated cruelty and habitual drunkenness cannot, in the absence of cross-errors, be questioned on writ of error by the wife to review the judgment of the Appellate Court, which reversed the decree of the trial court in her favor upon the ground that both parties were equally guilty.

3. DIVORCE—*divorce is a remedy provided for innocent party.* Where each party has cause for divorce against the other of the same statutory character neither can be granted a divorce, and a defendant charged with extreme and repeated cruelty may show in defense that the complainant was equally cruel.

4. SAME—*what must be considered where husband defends on ground that wife was cruel.* Where a wife sues for divorce on the ground of extreme and repeated cruelty and the husband defends on the ground that the wife was equally cruel, the relative rights of the parties which the marriage has created, and the physical constitutions and temperaments of parties, must be considered.

5. SAME—*clear case is required to justify granting divorce to husband for cruelty of wife.* It must be a clear case which will justify a court in granting the husband a divorce on the ground of extreme and repeated cruelty by the wife, and it is not sufficient to show slight acts of violence on her part, where there is no reason to suppose he will not be able to protect himself by the exercise of his marital rights.

6. SAME—*when wife's acts of violence do not preclude her getting a divorce for cruelty.* Where the evidence shows that the defendant was guilty of gross acts of violence and cruelty toward his wife, acts of violence on her part, consisting mainly in resisting his ill-treatment or provoked by his inexcusable conduct, are not a defense and do not bar her right to a divorce.

7. SAME—*what does not show that wife was guilty of habitual drunkenness.* The facts that the wife occasionally drank intoxicating liquor at her husband's request to keep him from getting angry at her, and that for a time she drank beer on her physician's advice, do not make a case of habitual drunkenness, such as constitutes a defense to a charge of habitual drunkenness on the part of the husband, which is clearly established.

8. SAME—*verdict of jury in a divorce case has the force of a verdict at law.* Under the statute either party to a divorce suit has a right to a trial by jury having all the incidents of a trial at common law, and the verdict is not merely advisory but has the same force and effect as a verdict in a suit at law, and should not be set aside unless clearly against the preponderance of evidence.

9. SAME—*decree for alimony may be modified as changed conditions may require.* A decree for alimony requiring the payment of a fixed sum per month for the support of the complainant and her child may be modified by the Supreme Court if the allowance is deemed excessive, and the decree as modified may be further modified from time to time by the trial court, as changed circumstances may require.

WRIT OF ERROR to the Appellate Court for the Second District;—heard in that court on appeal from the Circuit Court of Mercer county; the Hon. EMERY C. GRAVES, Judge, presiding.

W. J. GRAHAM, and GEORGE W. WERTS, JR., for plaintiff in error.

CHURCH & CHURCH, for defendant in error.

Mr. CHIEF JUSTICE CARTER delivered the opinion of the court:

Plaintiff in error, Anna Louise Garrett, filed her bill for divorce March 21, 1910, in the circuit court of Mercer county against her husband, Robert Lee Garrett. The bill alleged that she was a resident of Mercer county and had conducted herself as a chaste and dutiful wife, but that her husband had been guilty of extreme and repeated cruelty and for more than two years had been a habitual drunkard.

The defendant in error answered, denying all the material allegations of the bill, and charging his wife with extreme and repeated cruelty toward him and with habitual drunkenness for more than the statutory period. The cause was submitted to a jury on the issues whether the husband had been guilty of habitual drunkenness or extreme and repeated cruelty, whether the wife had been guilty of habitual drunkenness or extreme and repeated cruelty, and whether she was a resident of Mercer county when the bill was filed. The jury returned a verdict on all issues in favor of the wife. Motion for new trial having been overruled, a decree was entered granting the wife a divorce, alimony and solicitor's fees and the custody of their only child. On appeal the Appellate Court reversed the decree on the ground that the parties were equally in fault. The case has been brought here on petition for *certiorari*.

The first question to be considered is whether the circuit court of Mercer county had jurisdiction. No cross-errors have been assigned by defendant in error, but as the question of complainant's residence in a divorce case goes to the jurisdiction of the subject matter of the suit it is open to consideration even though not raised or passed upon in the Appellate Court. (*Becklenberg* v. *Becklenberg*, 232 Ill. 120.) The parties to this cause had been married about seven years when the bill was filed. Defendant in error owned a farm in Mercer county, and they had resided thereon practically all the time after their marriage until a few months before the institution of this litigation. Late in the year 1909 the farm was rented until a year from the following March and the wife went to Texas to visit her parents. The husband secured a lease for a single room in a house in the village of Alexis, a mile and a half from the farm. Alexis is on the county line between Warren and Mercer counties but the leased room was in Warren county. The wife returned from Texas in February, 1910, and she, with her husband and child, remained with the tenant on

the farm for a short time and then went to the room in Alexis. The husband had removed some of his household goods to the room but had left a part of them and some farming implements on the farm with the consent of the tenant. The evidence tends to show that he intended to keep his residence on the farm and vote there because the taxes were lower than in the village, and would probably return to the farm at the end of the rental year. After stopping with her husband ten days in the village plaintiff in error went with her child to Aledo, the county seat of Mercer county, where, after consulting a solicitor, this bill was filed. Service was had upon the husband in Mercer county. The proof shows, in our judgment, that the residence of the husband at that time was in Mercer county, and his residence was the residence of the wife. The circuit court therefore had jurisdiction to hear this cause.

The Appellate Court held that the evidence justified the jury in finding that the husband had been guilty of extreme and repeated cruelty towards the wife, and that he had also been guilty of habitual drunkenness for the space of two years. No cross-errors have been assigned by defendant in error, therefore those conclusions cannot be questioned here. (*Vose* v. *Strong,* 144 Ill. 108; *Kantzler* v. *Bensinger,* 214 id. 589; *Expanded Metal Fireproofing Co.* v. *Boyce,* 233 id. 284.) As the charges against the wife of extreme and repeated cruelty towards her husband and habitual drunkenness must be considered in the light of his actions towards her, it is necessary to consider briefly this evidence.

At the time of the hearing in the trial court the husband was forty-six years of age and his wife twenty-six. Two children were born of the marriage,—a boy, who died when nine months old, and a little girl about three years old. The evidence is uncontradicted that the husband drank steadily from the time of the marriage up to the time of the trial. The wife testified that he was intoxicated a large part of the time after their marriage, and we think the great weight

of the testimony in this record supports her on that point. He himself admits that he was in the habit of using intoxicating liquor and sometimes drank as much as a half pint of liquor before breakfast. The preponderance of the evidence also shows that he had repeatedly used personal violence towards the wife. It stands uncontradicted in the record that her person bore marks of this violence several times during their married life. Indeed, it is not attempted to seriously controvert either that he had treated his wife with extreme and repeated cruelty or that he had been guilty of habitual drunkenness. The chief contention of defendant in error here is that the wife cannot obtain relief because she herself was equally guilty as to both charges.

It is the settled law that divorce is a remedy provided only for an innocent party, and when each party has cause for divorce against the other of the same statutory character neither can be granted a divorce; that a defendant charged with extreme and repeated cruelty may show in defense that the complainant was equally cruel. (*Duberstein* v. *Duberstein,* 171 Ill. 133.) It has, however, always been the rule in this State that while the general principles of law are the same whether the suit be instituted by the husband or the wife, in the application of these principles it is necessary to consider the relative rights which the marriage has created, the physical constitutions and temperaments of the parties, and that it must be a clear case which will induce the court to grant a divorce on the application of the husband for the cruelty of the wife. (*De La Hay* v. *De La Hay,* 21 Ill. 251.) It is not sufficient to show slight acts of violence on her part towards him, so long as there is no reason to suppose that he will not be able to protect himself by the exercise of his marital powers. (*Aurand* v. *Aurand,* 157 Ill. 321; *Duberstein* v. *Duberstein, supra.*) The mere violence of the wife from which the husband can easily protect himself is not cruelty. The husband may protect himself by using necessary force, but he must not

retaliate by giving blow for blow. (1 Nelson on Divorce and Separation, sec. 306, and cases cited; 9 Am. & Eng. Ency. of Law,—2d ed.—804; 14 Cyc. 602.) Bishop lays down the general rule that though the ill-conduct of the wife was such as to contribute in a measure to what she complained of in her husband, and though his ill-conduct did not reach the extreme point, still if the latter was very aggravated she might have her divorce for it. (1 Bishop on Marriage and Divorce,—5th ed.—sec. 768.) There are degrees of abuse which no provocation can justify. She may be entitled to a divorce even if she has been guilty of sudden acts of retaliation, if such acts were provoked by defendant. (1 Nelson on Marriage and Divorce, sec. 329.) In the light of these authorities we will proceed to consider the evidence which is alleged to show such misconduct on the part of the wife as to compel the court to refuse to grant her relief.

Two occasions are especially relied on as showing that the wife had treated the husband with personal violence. On one occasion she and her husband were driving in a livery rig. Defendant in error and Mrs. Westerfield were on the front seat, and plaintiff in error, her little girl and Mr. Westerfield were on the back seat. Garrett testified that he had been whipping the team and waving the whip over the horses' heads and his wife got to fussing about it and tried to take the whip out of his hands; that he and Westerfield left the carriage for a few moments, during which time his wife threw the whip away; that when he came back and took the lines the row started because she did not want him to drive so fast. From the testimony of the Westerfields it appears that Mrs. Garrett struck defendant in error in the mouth, making it bleed; that he got out of the buggy and went toward the back seat, and that she held a bottle of beer, and, using a vile epithet, told him to get in the buggy and behave himself or she would "brain" him. The wife agrees as to the cause of the diffi-

culty but says her husband called her a vile name and she slapped his face; that he came around to the side of the buggy, threatening to choke her, and she picked up a bottle and called him a "dirty, white-livered cur," and told him if he touched her she would lay him out like a dog. It is apparent from the testimony of all that the defendant in error had been drinking heavily at this time; that they were carrying liquor in the buggy and drinking; that the three who were riding with defendant in error were trying to persuade him not to whip the horses and that the women were badly frightened; that Mrs. Westerfield had taken the lines from him before the end of the row because of his actions.

The other occasion relied on was while the couple were living on the farm. The defendant in error came home in the middle of the afternoon, drunk and quarrelsome, and wanted his wife to go back to town with him, which she refused to do. She testified that she called him a "dirty coward;" that he grabbed her by the throat and spit in her face and struck her twice on the head, and that she then ran into the kitchen and seized a fire shovel, and on his following her into the kitchen she struck at him with the shovel, and as he raised his arm just at that time the shovel hit him on the side of the face; that he then threw her against the wall and across a chair; that the hired man made him stop. He claims that when his wife struck him with the coal shovel he was doing nothing in particular but had his hands folded behind his back; that she used all the force she had, and he could not see out of one eye the next morning. The hired man in question did not testify but his affidavit was admitted as evidence on the trial, in which he swore that while in his presence Garrett did nothing to his wife on the occasion when she struck him with the shovel. Garrett testified that on several other occasions his wife struck him with her fist.

Defendant in error also testified that his wife used violence towards him and called him vile names a few days before she finally left him. It appears that he insisted on getting into bed, when under the influence of liquor, with some of his clothes on, and, on her objecting, a quarrel arose which ended in a physical contest. The testimony of the husband and wife is not in accord as to just what took place, but he admits that he finally succeeded in "licking her," as he put it, admitting that he tore her petticoat off and tore her other clothes, and that she took the baby and went through the snow to a neighbor's home, where she spent the rest of the night. The uncontradicted evidence shows that she carried black and blue marks as a result of his treatment for some time thereafter, and she testified that at the time of the trial she had not entirely recovered.

As further characterizing Garrett's actions towards his wife another instance of his repeated ill-treatment should be referred to. He had a loaded revolver in the house, and she testified that being afraid, on account of certain things he had said, that he would use it, she took it from the bureau drawer and hid it under the mattress. While under the influence of liquor he found that it was gone from the bureau, and, pointing his shot-gun at her while she was in bed with the baby, told her if she did not give up the revolver he would shoot her. He testified that the gun was not loaded, while she testified that she thought it was. The revolver was loaded. She grabbed the gun, and after a little struggle he seems to have set the gun down and found the revolver under the mattress, and they struggled over that, when she finally told him if he would call one of the hired men from the barn and give the revolver to him she would let him have it. As a result he took the revolver and ejected the cartridges from it and threw it into the fire.

Before commenting further on the question of the plaintiff in error using physical violence towards her husband, it seems necessary to take up and discuss the question as to

whether she was guilty of habitual drunkenness. Cruelty, especially by the husband, seems naturally to arise from the excessive use of liquor. This court long ago said: "A sober man would scarcely dare to strike a woman, while one under the debasing influence of liquor might be guilty of any enormity." (*Coursey* v. *Coursey,* 60 Ill. 186.) The defendant in error testified that his wife often took a drink or two, and as a result would lie down and say she was dizzy; that she often requested him to bring home liquor, and had been in the habit of drinking ever since their marriage. One witness who testified for defendant in error states that he had lived with them for two or three years but had never seen her under the influence of liquor except on two occasions. She denied being intoxicated on either occasion, and she is corroborated as to one occasion by a disinterested witness, who also testified that he had frequently heard her refuse her husband's invitation to drink with him. Two other witnesses testified that they had seen her drink whisky a number of times, and one of them said she had on one occasion asked for a drink of beer. She testified that she first drank beer when it was prescribed for her by the physician to "make nurse" for her first baby, so that she drank it for a few weeks and then ceased its use; that her husband had often asked her to drink with him and she generally refused, but sometimes drank because she wanted to please him; that she was never intoxicated. Habitual drunkenness, as that phrase is used in our statutes, has been defined to be an irresistible habit of getting drunk; (1 Nelson on Divorce and Separation, sec. 350;) a fixed habit of drinking to excess; (1 Bishop on Marriage and Divorce, sec. 813;) an involuntary tendency to become intoxicated, which is acquired by frequent repetition,—such a frequent indulgence to excess as to show a formed habit and inability to control the appetite. (*Murphy* v. *People,* 90 Ill. 59; 14 Cyc. 622.) The evidence in this record shows that the wife's drinking had been brought

about and encouraged by the husband; that when she drank, it was usually because she wanted to keep him from being angry with her. One witness testified that defendant in error told him his wife did not drink but he could get witnesses to testify she did, and he had to prove that she did drink in order to beat her in the divorce suit. While the evidence is not in entire harmony on the question of her drinking, it does show conclusively, in our judgment, that she was not guilty of habitual drunkenness, as that term is used in our statute and understood in law.

Without question plaintiff in error said and did things that a wife under ordinary circumstances never should say or do to her husband, but in almost every instance in the record the evidence tends to show he had first provoked and exasperated her by his words or actions. It is very difficult to say how much ill-behavior on the part of the wife will in a given case take away her remedy. It has been said that "the criterion by which, in human tribunals, the conduct of human beings is to be estimated, should be formed, not according to the rule of ideal perfection or of occasional excellence, but according to the standard which, being attainable by the various classes to which it is to be applied, is sufficiently high to insure the preservation and promotion of the morals and good of society." (*Mayhugh* v. *Mayhugh*, 7 B. Mon. 424; 1 Bishop on Marriage and Divorce,—5th ed.—768.) The court, in deciding each question, must necessarily look to see which of the parties was first to blame. If the evidence shows that the acts complained of consisted mainly of resistance to ill-treatment, such acts cannot be set up to show extreme and repeated cruelty, within the meaning of the statute. (*Youngs* v. *Youngs*, 130 Ill. 230.) Under the statute either party has a right to have the divorce heard by jury, and the jury trial has all the incidents of a trial at common law, the verdict having the same force and effect, not being merely advisory, as in an ordinary chancery suit. (*Lenning* v.

*Lenning,* 176 Ill. 180; *Berg* v. *Berg,* 223 id. 209.) The presumption is in favor of the verdict until it is successfully impeached in some mode provided by law. (*Becker* v. *Becker,* 79 Ill. 532.) In this case the judge and jury saw the witnesses, heard them testify, and had vastly superior advantages for ascertaining the truth and detecting falsehood over any court sitting as a court of review. They could judge much better than this court as to the relative position and strength and the ability of the husband to pro- tect himself against the wife. For this reason we should hesitate to disturb their verdict. We are, however, con- strained to hold that this record shows that while the wife said and did things that would not tend to promote proper family relationship, she was provoked to do this by the inexcusable conduct of her husband. He practically admits that on account of his superior size and strength he was able to protect himself from injury from her. In most, if not all, instances her acts were in self-defense. The habit- ual drunkenness of the husband and his physical treatment of her was of a degree so gross that it is the duty of the court to interfere and grant a divorce to the wife.

The contention is also made that the decree of the trial court is erroneous as to the amount of alimony. As finally entered the decree allowed $50 a month,—$35 for the wife and $15 for the child. The testimony shows that the wife had no property, and that as the child was but three years of age the wife could not seek employment and thus sup- port herself. The evidence shows that the husband owned a farm of 170 acres, mortgaged for $7500, and worth, ac- cording to various witnesses, from $150 to $225 an acre and renting at $6 an acre. It also shows that he had a small amount of personal property, and was in debt, be- sides the mortgage, several thousand dollars. Under the facts in this record we are of the opinion the allowance of $50 per month was excessive. The decree will therefore be modified by requiring the defendant in error to pay to

the plaintiff in error, for the support of herself and child, the sum of $400 per year, in quarterly installments of $100 each, beginning with the date of the decree. The circuit court has power to modify this decree from time to time as changed circumstances may require. *Hilliard* v. *Anderson,* 197 Ill. 549.

The judgment of the Appellate Court will be reversed and the decree of the circuit court, as modified, will be affirmed.

*Judgment of Appellate Court reversed.*

*Decree of circuit court modified and affirmed.*

Mr. JUSTICE COOKE took no part in the consideration or decision of this case.